

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00392-CV

BP AMERICA PRODUCTION COMPANY, APPELLANT

V.

LADDEX, LTD., APPELLEE

On Appeal from the 31st District Court
Roberts County, Texas
Trial Court No. 1944, Honorable Steven R. Emmert, Presiding

February 17, 2015

OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Appellant, BP America Production Company (BP), appeals a judgment finding that its mineral lease covering certain lands had terminated for failing to produce in paying quantities and declaring that appellee, Laddex, Ltd., possesses all right, title, and interest to the mineral estate on the land by virtue of its subsequent lease. We will reverse and remand.

Factual and Procedural Background

On January 13, 1971, an oil and gas lease ("the Arrington lease") covering certain property in Roberts County was executed, providing for a primary term of five years and further providing that the lease would continue thereafter as long as oil or gas is being produced from the land. The landowners expressly retained the right of reverter. Under this lease, one producing well was drilled on the property. Eventually, these leasehold rights were assigned to BP.

The well on the property produced steadily until August of 2005, when production slowed significantly. Inexplicably, in November 2006, the well resumed producing in quantities comparable to what it had produced prior to its 2005 slowdown.

In 2007, the landowners entered into a "top lease" with Laddex which purported to convey the landowners' reversionary interest in the mineral estate of the property covered by the Arrington lease to Laddex ("the Laddex lease"). However, as a top lease, the terms of the Laddex lease provide that it cannot begin until the Arrington lease is terminated, either by BP's written release or by judgment terminating the Arrington lease.

A month after the Laddex lease was completed, Laddex filed suit seeking termination of the Arrington lease and possession of the mineral estate. The basis of Laddex's claims was that, during the fifteen months of slowed production, there was no production in paying quantities under the Arrington lease and, therefore, the lease should be terminated. The effect of the termination of the Arrington lease would be that the Laddex lease would entitle Laddex to assume operations.

Before trial, BP moved the trial court to dismiss Laddex's claims for lack of subject matter jurisdiction on the basis that the Laddex lease was void because it violates the Rule against Perpetuities. The trial court heard this motion and denied it by written order.

The case went to trial. Testimony was presented over five days. The jury returned a verdict finding that the well failed to produce in paying quantities under the Arrington lease and that a reasonably prudent operator would not continue to operate the well for profit. On the basis of this verdict, the trial court entered judgment declaring the Arrington lease terminated and finding that the mineral estate reverted back to the landowners and to their lessee, Laddex. BP moved for judgment notwithstanding the verdict and for new trial, which were denied. BP filed notice of appeal.

BP presents three issues by its appeal. By its first issue, BP contends that the trial court erred in overruling BP's motion to dismiss for lack of jurisdiction based on the Laddex lease being void because it violates the Rule against Perpetuities. BP's second issue contends that there was no evidence that the well on the property had ceased producing in paying quantities and that a reasonably prudent operator would not have continued to operate it for profit. Finally, BP's third issue contends that the jury charge in this case allowed the jury to rely on expert testimony that was not reliable, relevant, or competent.

## Issue One: Standing

BP's first contention is that the trial court lacked subject matter jurisdiction over this case because Laddex lacked standing due to its top lease being void because it

violates the Rule against Perpetuites ("the Rule").  Laddex responds by contending that the Laddex lease does not violate the Rule because it conveyed to Laddex a present and vested interest in the landowners' right of reverter.

Our jurisdiction over the merits of this case extends no further than the jurisdiction possessed by the trial court.  *See Pearson v. State*, 315 S.W.2d 935, 938 (1958).  If the trial court lacked jurisdiction, this court only has jurisdiction to set any judgment aside and dismiss the cause.  *See City of Garland v. Louton*, 691 S.W.2d 603, 605 (Tex. 1985).  Whether the trial court had subject matter jurisdiction is a question of law that we review *de novo*.  *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

Standing is a constitutional prerequisite to a court's subject matter jurisdiction. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012).  A plaintiff must have standing at every stage of the legal proceedings, including appeal.  *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001).

"Perpetuities . . . shall never be allowed . . . in this State."  TEX. CONST. art. I, § 26.  The Rule provides that "no interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance."  *Peveto v. Starkey*, 645 S.W.2d 770, 772 (Tex. 1982).  A challenged conveyance must be viewed as of the date the instrument is executed, and it is void if by any possible contingency the conveyance could violate the Rule.  *Id.*  The Rule is not applicable to present interests or future interests which vest at their creation.  *Bagby v. Bredthauer*, 627 S.W.2d 190, 194 (Tex. App.—Austin 1981, no writ).  As applicable to

4

the Rule, the word "vest" refers to an immediate, fixed right of present or future enjoyment of the estate or interest. *Id.* The estate or interest may vest in interest before it vests in possession. *Id.*

The common oil and gas lease is a fee simple determinable estate in the realty. *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991); *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991). A lessor is left with a possibility of reverter, which is the presently vested right to future possession of the mineral estate upon termination of the lease. *See Luckel*, 819 S.W.2d at 464. As such, upon termination of the lease, the mineral estate ordinarily reverts to the owner of the mineral estate. *Snow*, 819 S.W.2d at 468. However, the owner of the mineral estate can sell or assign the possibility of reverter. *See id.*; *Hamman v. Bright & Co.*, 924 S.W.2d 168, 171 (Tex. App.—Amarillo 1996, writ granted w.r.m.).

Being a presently vested interest, the possibility of reverter is not subject to the Rule. *Hamman*, 924 S.W.2d at 171. A conveyance of all or a portion of this present interest does not violate the Rule. *Id.* However, if the conveyance is of an executory interest which cannot vest until a condition precedent occurs, the interest is subject to the Rule. *Id.* In construing the vesting of an interest, the earliest possible time of vesting is favored and an interest will be construed as vested whenever it can be reasonably construed as such. *See McGill v. Johnson*, 799 S.W.2d 673, 675 (Tex. 1990).

Looking at the language contained within the Laddex lease, it expressly acknowledges that it is a "top lease" and that the "primary term" of the lease

commences on the date that written releases of the last recorded "base lease" is filed in the public records or judgment terminating the base lease becomes final and nonappealable. The lease further provides that it "is intended to and does include and vest in [Laddex] any and all remainder and reversionary interest . . . in the Leased Premises upon expiration of any prior oil, gas or mineral lease . . . ." Thus, while the Laddex lease does not convey the landowners' right of reverter, it does convey a vested interest in the landowners' reversionary right. This reversionary interest in the mineral estate does not come into existence upon the expiration of the Arrington lease, it came into existence and was presently vested in the landowners upon execution of the Arrington lease. Thus, the Laddex lease simply conveys to Laddex a presently vested interest in the mineral estate.[1] *See* 1 Ernest E. Smith & Jacqueline Lang Weaver, TEXAS LAW OF OIL AND GAS § 4.2[C], at 6-7 (LexisNexis Matthew Bender 2014) (discussing vesting of top leases). The only right that is not presently vested is the right of possession. Because the Laddex lease conveys a presently vested interest, it is not subject to the Rule. *See Hamman*, 924 S.W.2d at 171.

BP cites *Peveto* and *Hamman* as invalidating the Laddex lease for violating the Rule. In *Peveto*, the Texas Supreme Court held that a conveyance of a vested interest in property was made contingent and, therefore, violated the Rule when a clause was added to the conveyance that provided that the grant "shall become effective only upon the expiration of" a then-existing deed. *Peveto*, 645 S.W.2d at 772. The Court explained that the words "'effective only upon' created a springing executory interest . . . which may not vest within the period of the Rule; therefore, the deed is void." *Id.* We

---

[1] It may be that the landowners' right of reverter under the top lease violates the Rule. However, that issue has not been presented to this Court.

read *Peveto* as providing that the conveyance violated the Rule because the conveyance of the vested interest was made contingent upon a future happening. By contrast, the conveyance in the Laddex lease is not made contingent upon any happening. Rather, the full presently vested right to future possession of the mineral estate of the landowners was leased to Laddex without any condition other than that inherent in the possibility of reverter. *See Luckel*, 819 S.W.2d at 464; *Snow*, 819 S.W.2d at 468.

In *Hamman*, this Court addressed a top lease in which the lessors retained all vested interests in the bottom lease until it terminated. *See Hamman*, 924 S.W.2d at 172. This Court held the top lease violated the Rule because it did not make a present conveyance of the lessors' reversionary interest in the mineral estate. *Id.* Rather, the top lease conveyed interests "that would vest in the grantee only upon termination of the bottom leases . . . ." *Id.* at 172-73. As such, the interests that were conveyed "had the potential for vesting outside the period provided by the Rule, and are void as a matter of law." *Id.* at 173.

In both of these cases cited by BP, the interest that was conveyed was not a presently vested interest and the vesting of the interest was made conditional upon the termination of some then-existing interest. By contrast, the Laddex lease conveys a presently vested interest in the mineral estate and does not condition the vesting of this interest on any occurrence. The only limitation on the interest conveyed is that Laddex does not have a present right of possession, which is the common limitation on the landowners' possibility of reverter. As such, we disagree with BP's contention that the Laddex lease violates the Rule and overrule BP's first issue.

7

## Issue Three: Jury Charge Error

By its third issue, BP contends that the trial court abused its discretion in its charge to the jury because its question regarding whether the lease had ceased producing in paying quantities was insufficient as a matter of law to support the judgment.

We review claimed error in the court's charge under an abuse of discretion standard. *See Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex. 1990). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A trial court's clear failure to analyze or apply the law correctly constitutes an abuse of discretion. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding); *Cayton v. Moore*, 224 S.W.3d 440, 445 (Tex. App.—Dallas 2007, no pet.).

The controlling issue in this case, whether a mineral lease should be terminated, is assessed through a two-step test for determining profitability: (1) viewed over a reasonable period of time, did the lease cease to pay a profit after deducting operating and marketing expenses, in other words, did the lease cease to produce in paying quantities; and (2) would a reasonably prudent operator continue to operate under the lease for profit and not merely for speculation. *See Pshigoda v. Texaco, Inc.*, 703 S.W.2d 416, 418 (Tex. App.—Amarillo 1986, writ ref'd n.r.e.) (discussing the law as established by *Skelly Oil Co. v. Archer*, 356 S.W.2d 774 (Tex. 1961); *Clifton v. Koontz*, 325 S.W.2d 684 (Tex. 1959); and *Garcia v. King*, 164 S.W.2d 509 (Tex. 1942)).

We will focus our analysis on BP's challenge to the first question contained in the jury charge: "From August 1, 2005 to October 31, 2006, did the Mahler D-2 Well fail to produce in paying quantities?" BP objected to this question on the basis that limiting the inquiry to a specific fifteen-month period during which the lease experienced a slowing of production was not a reasonable period of time.

The controlling issue that the trial court was required to submit to the jury in this case was whether the lease failed to produce in paying quantities over a reasonable period of time. *Id.* The fifteen-month period that was identified as the relevant period in the jury charge constituted a specific period in which the lease had slowed in its production. However, by the time the top lease was executed, the evidence established that the Arrington lease had resumed production in paying quantities. "Production in paying quantities" means production sufficient to pay the lessee a profit, even small, over the operating and marketing expenses of the well. *See Koontz,* 325 S.W.2d at 691; *Garcia*, 164 S.W.2d at 511; *Pshigoda*, 703 S.W.2d at 418. Because the undisputed evidence established that the Arrington lease had resumed profitable production,[2] the jury question, which isolated a fifteen-month period that was not reflective of the true profitability of the lease, limited the jury's consideration to a period of time that was not reasonable to assess whether the lease had ceased to produce in paying quantities.[3] Certainly, evidence that a lease had returned to profitable

---

[2] Notably, Laddex never attempted to controvert whether the Arrington lease had returned to profitability by the time that the top lease was executed. Laddex downplays the return to profitability as producing only a small profit. However, this is sufficient to raise the issue of whether the lease was producing in paying quantities when production is assessed over a reasonable period of time.

[3] Our determination that the trial court failed to inquire about whether the lease produced in paying quantities over a reasonable period of time should not be construed as a determination of what would be an appropriate period of time in this case. What constitutes a reasonable period of time

production is material to the determination of whether a jury question inquires about a period that is reasonable under the circumstances. *See Koontz*, 325 S.W.2d at 691. For the foregoing reasons, we conclude that the trial court failed to apply the law correctly in the first question of the jury charge.[4] Consequently, we determine that the trial court abused its discretion, sustain BP's third issue, and reverse the trial court's judgment terminating the Arrington lease.

## Issue Two: No Evidence to Terminate BP's Lease

Through its second issue, BP contends that the trial court erred in terminating its lease because there was no evidence that the well on the property had ceased producing in paying quantities and that a reasonably prudent operator would not have continued to operate it for profit.

Because we have determined that the trial court abused its discretion in limiting the period of inquiry to the fifteen-month slowdown in production, the jury was not asked to determine whether there was a cessation of production in paying quantities over a reasonable period of time. As such, the issue becomes whether there was sufficient evidence to have allowed a reasonable jury to determine that the lease had ceased to produce in paying quantities over a reasonable period of time. The record contains conflicting evidence regarding the amount of production and the profit or loss over the

---

depends upon the circumstances of each case. *Pshigoda*, 703 S.W.2d at 419. Our holding in this case is simply that uncontroverted evidence of a return to profitable production for five months prior to execution of Laddex's top lease and six months prior to filing of suit is a circumstance that must be considered in any assessment of whether the Arrington lease had ceased to produce in paying quantities over a reasonable period of time.

[4] Having determined that the first question of the jury charge constitutes an abuse of discretion, we need not address BP's challenges to the second and third questions. *See* TEX. R. APP. P. 47.1.

10

fifteen-month period specified in the trial court's jury question number one. There was also evidence that the lease had resumed some degree of profitable production after the fifteen-month period. However, because the jury charge unduly limited the jury's consideration of the profitability of the production under the lease, the jury did not assess whether this evidence established that the lease produced in paying quantities over a reasonable period of time. Our review of the record evidence reveals that there was sufficient evidence to have allowed a reasonable jury to differ as to whether the lease produced in paying quantities when a reasonable period of time is considered.

Consequently, we overrule BP's legal sufficiency challenge.

Conclusion

For the foregoing reasons, we reverse the judgment of the trial court and remand this cause for a new trial. *See* TEX. R. APP. P. 43.2(d).

Mackey K. Hancock
Justice

11